*Edward D. Bassett, John M. Brennan & James F. Murphy,* for respondents.

---

### SUPREME ASSEMBLY OF THE ROYAL SOCIETY OF GOOD FELLOWS *vs.* JOHN H. CAMPBELL, Administrator, *et als.*

On the death of A. unmarried and intestate, his mother, brothers, and sister, the last being represented by her husband, agreed in writing that J., one of the brothers, should be appointed administrator, that J. should arrange for the care of the burial lot and the erection of a tombstone, should receive orders for the life insurance of A., should pay the debts of A., and should divide the residue equally among the next of kin of A. J. was appointed administrator, the sister and her husband signing the petition for his appointment. It turned out that the life insurance policies were payable to the sister, and she gave to J. orders to collect the amounts due on them, but afterwards revoked the orders.

*Held,* that the agreement had been ratified by the sister.

*Held,* further, that the agreement was a fair family arrangement, of which the sufficient consideration was the surrender by each of a possibly larger share in the decedent's estate for a certainly equal one.

*Held,* further, that in such a family arrangement the care of the burial lot was a sufficient consideration. In such arrangements courts do not examine the *quantum* of consideration.

*Held,* further, that the ratification of the agreement by the sister and her delivery of the orders for the life insurance moneys were an equitable assignment of the moneys to J., for the purposes of the agreement; that the orders were coupled with an interest, and were irrevocable.

BILL OF INTERPLEADER.

*June* 20, 1891.    MATTESON, C. J.   This is a bill of interpleader to determine to whom shall be paid a benefit fund of one thousand dollars due from the complainant on account of the death of Duncan Campbell, one of its members.   This fund is claimed on the one hand by the respondent, John H. Campbell, administrator of the estate of the deceased, by virtue of an agreement entered into as herein set forth, and on the other by the respondent, Phebe A. Greenhalgh, wife of the respondent, James I. Greenhalgh, who, under the name of Phebe A. Metcalf, her name prior to her mar-

riage with Greenhalgh, is designated as the beneficiary in the certificate of membership issued by the complainant to the deceased. The deceased died December 7, 1887, unmarried, leaving as his next of kin the respondents, Catherine Campbell, his mother; John H. Campbell, Frank E. Campbell, his brothers; and Phebe A. Greenhalgh, his sister. On December 12, 1887, a meeting was held, at which all of the respondents except Mrs. Greenhalgh were present, for the purpose of arranging for the settlement of his estate. At this meeting an agreement was entered into by which it was provided that John H. Campbell should be appointed administrator; that he should pay all bills owed by the deceased at his death; that he should put in order the burial lot in Swan Point Cemetery according to the rules and regulations of the cemetery; that a suitable headstone should be erected to the memory of the deceased, at a cost not exceeding one hundred dollars; that the administrator should have orders on the different organizations to which the deceased belonged for the full amount of insurance in such organizations, and that the moneys collected thereon, or from any other source, should be placed in a general fund; that the sums required for the purposes specified, and also to provide for the perpetual care of the burial lot, should be paid by the administrator out of such general fund, and that the next of kin should share equally in the residue, no matter to whom the certificates of membership held by the deceased in the several societies might have been made payable. Mrs. Greenhalgh was represented at this meeting by her husband, and he entered into and signed the agreement in her behalf. The valuable papers of the deceased were contained, at the time of his death, in a package kept in the safe of the Providence Gas Company. These papers were taken by John H. Campbell to the meeting; but the package was not opened until the signing of the agreement, and none of the respondents knew until after the package was opened, who had been named as beneficiary in the certificates of membership. Pursuant to the agreement, John H. Campbell was subsequently appointed administrator and accepted the office, Mrs. Greenhalgh and her husband both signing the application for his appointment. Powers of attorney from Mr. and Mrs. Greenhalgh to the administrator, dated December 19, 1887, were prepared and executed, authorizing

him to demand, recover, receive, and receipt for all sums of money due or payable to Mrs. Greenhalgh, formerly Phebe A. Metcalf, from the societies of which the deceased was a member, by reason of his death. These powers of attorney were subsequently left by the administrator with these societies; but, before the moneys due from them had been paid to the administrator, Mr. and Mrs. Greenhalgh caused notices to be served upon the different societies revoking the powers of attorney, and forbidding the payment of the moneys. The administrator first learned of the revocation of the powers of attorney about the first of the following February or March, and had in the mean time, on the faith of the agreement, ordered a headstone, and contracted for the improvement of the burial lot and for its perpetual care. The complainant declined to pay the money to Mrs. Greenhalgh without the surrender of the certificate issued by it to the deceased. Mrs. Greenhalgh thereupon requested the administrator to deliver the certificate to her, but the administrator refused to comply with her request. Up to this time the certificate had remained without objection in the possession of the administrator. No adjustment of the matter having been made by the respondents, the complainant, after a year or more had elapsed, filed this bill.

In behalf of Mrs. Greenhalgh it is contended that the agreement was void for want of consideration.

The purpose of the agreement was to provide for the settlement of the affairs of the deceased and the amicable distribution among his next of kin of the surplus of his estate, including the benefit funds in the several societies referred to, after payment of his debts and the sums required for the objects specified. That distribution was not unreasonable, for it was an equal distribution among the next of kin, the same which the law makes of intestate estates. There is no charge of fraud or undue influence, and, so far as the testimony discloses, all of the parties to the agreement were possessed of equal knowledge and stood upon an equal footing. In the uncertainty as to who had been named as beneficiary or beneficiaries, each was willing to surrender his chance of getting a larger share, or the whole, for the certainty of an equal share with the others. If there was no other consideration for the agreement than this mutual surrender by each of his or her chance to

receive a larger share, we think the agreement could be supported. There are numerous cases of compromises of doubtful or disputed rights, not only between members of families but between strangers, which rest upon no other consideration than the surrender by the parties of a portion of such doubtful or disputed rights, and which have been upheld, though it may have appeared upon subsequent investigation or adjudication that one of the claimants had no right, or not so great a right as the share he received by the compromise, in the property in doubt or in controversy. In *Dunnage* v. *White*, 1 Swans. 137, 151, 152, the Master of the Rolls remarks: " Undoubtedly parties entitled in different events may, while the uncertainty exists, each taking his chance, effect a valid compromise."

The agreement in the case at bar was not strictly a compromise, since at the time it was made no dispute had arisen between the parties, and neither had made any claim to any greater share in the whole, or any part of the estate, than the others. There are, however, cases which do not involve any element of disputed right, and which, therefore, were no more compromises than the agreement in question, which rested upon the consideration of a mutual chance. In *Beckley* v. *Newland*, 2 P. Wms. 182, the complainant and respondent had married sisters, who were cousins and presumptive heirs of a Mr. Turgis, a very rich man. Turgis made a will, in which he left a large estate, real and personal, to the respondent, but only a small real estate to the complainant. Before the execution of the will the complainant and respondent had entered into articles by which they agreed that whatever should be given to either should be equally divided. The Lord Chancellor said: " A performance of these articles ought to be decreed, though there was no other consideration for them than the mutual benefit of the chance." In *Harwood* v. *Tooke*, 2 Sim. 192, the complainant was the nephew, heir at law, and one of the next of kin of William Tooke, a man of large property. The respondent was not related to William Tooke, but was an intimate friend. The complainant and respondent, both having expectations from him, agreed by parol to divide equally whatever he might leave them. He died in 1802, having left a much larger portion of his property to the complainant than to the respondent. The respondent, not wishing

to hold the complainant to the full extent of their agreement, proposed to accept 4,000 pounds in satisfaction of his claims, and the complainant gave him a promissory note for that sum. The respondent afterwards indorsed the note to Sir Francis Burdett as the consideration for the purchase of an annuity. The bill prayed that the note might be declared to have been unduly obtained from the complainant and without good or valuable consideration, and that it might be delivered up to be cancelled, and that the defendant might be restrained from using, applying, negotiating, or paying it away, or bringing an action against the complainant respecting the note. Lord Elden granted the injunction and the money was paid into court, but subsequently, upon hearing, dismissed the bill, and, upon rehearing, the decree of dismissal was affirmed. In *Wethered* v. *Wethered*, 2 Sim. 183, two sons agreed to divide equally whatever property they might receive from their father in his lifetime, or become entitled to under his will, or by descent or otherwise from him. It was held that the agreement was not against public policy, and would be enforced in equity.

But there is a class of cases of family arrangements, relating to the settlement of property, in which there is no question of doubtful or disputed rights, and in regard to which a peculiar equity has been administered in that they have been supported upon grounds which would hardly have been regarded as sufficient if the transaction had occurred between strangers. In these cases the motive of the agreements was to preserve the honor or peace of families or the family property. When such a motive has appeared, the courts have not closely scrutinized the consideration. *Trigg* v. *Read*, 5 Humph. Tenn. 529, 546; *Burkholder's Appeal*, 105 Pa. St. 31; *Appeal of Wilen*, 105 Pa. St. 121; *Walworth* v. *Abel*, 52 Pa. St. 370; *Farnsworth* v. *Dinsmore*, 2 Swan, Tenn. 38; *Williams* v. *Williams*, L. R. 2 Ch. App. 294, 304; *Hoghton* v. *Hoghton*, 15 Beav. 278; *Wycherly* v. *Wycherly*, 2 Eden, 175; *Frank* v. *Frank*, 1 Ch. Cas. 84; *Stapilton* v. *Stapilton*, 1 Atk. 2; *Pullen* v. *Ready*, 2 Atk. 587; *Cory* v. *Cory*, 1 Ves. 19; *Head* v. *Godlee*, Johnson, 536, 569.

In the case at bar the motive for the agreement was, as we have seen, to provide, among other things, for the amicable distribution among the respondents of the surplus of estate, including the

moneys payable on the benefit certificates, after the payment of debts, etc. This motive constituted a sufficient consideration within the law relating to family arrangements, and the agreement is therefore sustainable as a family arrangement. In *Hoghton* v. *Hoghton*, 15 Beav. 278, 300, it is said: "If the transaction be one which tends to the peace and security of the family, to the avoiding of family disputes and litigation, or to the preservation of the family property, the principles by which such transactions must be tried are not those applicable to dealings between strangers, but such as upon the most comprehensive experience have been found to be most for the interest of families."

*Williams* v. *Williams*, L. R. 2 Ch. App. 294, was a case the facts in which were as follows: A. died in 1831 possessed of real estate held in socage, gavelkind, and borough English tenures, and also of leaseholds, stock in trade, and other personal property. He made a will, by which, after certain provisions for his wife, he gave all his property to his two sons equally, but the will, being incomplete, was refused probate. At an interview between the brothers shortly after the will had been refused probate, the elder brother declared that the invalidity of the will should make no difference, and that the property should be "not mine or thine, but ours." No agreement in writing was made, but for twenty years after the death of A. the two sons carried on the partnership together, and dealt with the whole property, real and personal, as if it belonged to them equally. The widow never insisted upon her rights in her husband's property. In 1851 the partnership was dissolved. The younger brother having died, his representatives brought two suits, the first to determine the rights of the two brothers in certain real estates, alleging that a family arrangement had been made between them that they should be equally entitled to those estates; the second to take the accounts of the partnership which had been carried on between the two brothers. The elder brother, the respondent, denied any such arrangement as was alleged. The Vice Chancellor held that such a course of dealing had been proved as established the existence of a family arrangement which the court would uphold, and declared the complainant entitled to the relief prayed. The respondent appealed from this decree. Turner, Lord Justice, in his opinion, affirming the decree of the Vice Chan-

cellor, remarks : " Nor do I think there was any want of consideration. The Vice Chancellor has, and I think correctly, rested this part of the case upon the footing of the cases as to family arrangements. It was strongly argued for the appellant that this case does not fall within the range of those authorities ; that those cases extend no farther than to arrangements for the settlement of doubtful or disputed rights, and that in this case there was not, and could not be, any doubtful or disputed right. But this, I think, is a very short-sighted view of the cases as to family arrangements. They extend, as I apprehend, much farther than is contended for on the part of the appellant, and apply, as I conceive, not merely to cases in which arrangements are made between members of a family for the preservation of its peace, but to cases in which arrangements are made between them for the preservation of its property." He then refers to their settlement of family estates, upon an arrangement between the father and the eldest son on his attaining twenty-one, as a branch ·of these cases, and adds, " Certainly this court does not in such cases inquire into the *quantum* of consideration."

*Wycherly* v. *Wycherly*, 2 Eden, 175, was a case of the resettlement of property, in which a son upon his marriage had joined with his father in resettling the estate, and by a memorandum executed at the same time agreed to secure £500 to each of his sisters. It was held that there was a sufficient consideration for the court to decree specific performance of this agreement. The Lord Chancellor said : " I think the present was not a mere voluntary agreement, and the court will, and I am warranted by the precedents to say that it has done so, attend to slight considerations for confirming family settlements and modifications of property. They pay a regard to reasonable motives and honorable intentions. In these cases they will not weigh the value of the consideration. They consider the ease and comfort and security of families as a sufficient consideration."

But, independently of the considerations above mentioned, the agreement provides for putting in order the burial lot, and also for its perpetual care. These are matters outside of the administration. Each of the parties to the agreement, presumably on the faith of it, has, by signing it, consented to the reduction of his or her

distributive share of the estate by his or her proportion of the sums required for those purposes. It is possible that but for the agreement this consent would not have been given. This of itself would seem to furnish a sufficient consideration, and, as we have seen above, in cases of family arrangements, courts do not inquire into the *quantum* of the consideration.

It is further contended in behalf of Mrs. Greenhalgh that it clearly appears from the testimony that the only authority that her husband had was to represent her in relation to Duncan Campbell's estate, and not to give away her separate property; and that this fund was no part of his estate, but a gift from him to her. There would be force in the suggestion were it not that Mrs. Greenhalgh subsequently joined in the application for the appointment of the administrator, and in the execution of the powers of attorney to the administrator for the collection of the moneys in pursuance of the agreement, and thereby ratified the making of the agreement by her husband and cured the lack of authority, if the lack existed.

The counsel for Mrs. Greenhalgh further contends that the fund in question, being a *chose* in action, could not be conveyed by Mr. and Mrs. Greenhalgh, but could only be disposed of by a trustee of her estate appointed under Pub. Stats. R. I. cap. 166, § 18 or § 22. A *chose* in action is personal estate. Pub. Stats. R. I. cap. 166, § 6, authorizes any married woman to sell and convey, or to make contracts respecting the sale and conveyance, of any of her personal estate, other than that described in § 5 of the same chapter, with the same effect, and with the same rights, remedies, and liabilities, as if she were sole and unmarried. The personal estate described in § 5, though it embraces some *choses* in action, does not include such a *chose* as the fund in question.

We are of the opinion that the signing of the agreement and the subsequent ratification of it by Mrs. Greenhalgh, the execution and delivery of the power of attorney to collect the money, and the leaving of the certificate with the administrator for the purpose of enabling him to collect the money, were consistent only with an intention to transfer the fund to the administrator under the agreement, and operated as an equitable assignment of the fund accordingly. *Clemson* v. *Davidson,* 5 Binney, 391, 398; *Spain* v. *Ham-*

*ilton's Administrator,* 1 Wall. 604, 624 ; *Newby & Taylor* v. *Hill & Million,* 2 Metc. Ky. 530, 531, 532 ; *Wiggins* v. *McDonald,* 18 Cal. 126, 127 ; *Garnsey* v. *Gardner,* 49 Me. 167, 171, 172 ; *Wallace* v. *Walter Heywood Chair Co.* 16 Gray, 209.

We are further of the opinion that, an equitable assignment of the fund having thus been made, the power of attorney was coupled with an interest and therefore not revocable.

We decide that the respondent, John H. Campbell, administrator, is entitled to the fund in suit.

*Daniel R. Ballou, Frank H. Jackson & John Haskell Butler,* for complainant.

*Stephen A. Cooke, Jun., & Louis L. Angell,* for respondents, Greenhalgh.

*John J. Arnold,* for the other respondents.