NORTHWEST OIL & REFINING CO., a
Nevada corporation, Plaintiff,

v.

HONOLULU OIL CORPORATION, a cor-
poration, and Hunt Oil Company, a
corporation, Defendants.

Civ. No. 313.

United States District Court
D. Montana,
Billings Division.

July 5, 1961.

Luedke & Packwood, Billings, Mont., for plaintiff.

Coleman, Lamey & Crowley, Billings, Mont., for defendant Honolulu Oil Corp.

Cooke, Moulton, Bellingham & Longo, Billings, Mont., for defendant Hunt Oil Co.

JAMESON, District Judge.

Plaintiff, a Nevada corporation, seeks damages from Honolulu Oil Corporation and Hunt Oil Company, both Delaware corporations, for alleged failure to comply with a crude oil contract dated March 1, 1959, as amended by certain instruments hereinafter described. Both defendants have filed motions for summary judgment. There has been extensive discovery by all parties, particularly through admissions of facts and documents.[1]

The contract in question, between plaintiff and defendant Honolulu, provided for the sale by Honolulu to plaintiff of crude oil from the Fourbear Field in Park County, Wyoming, for the period March 1, 1959, to October 1, 1960, subject to yearly extensions by mutual agreement.[2] The contract provided that it would be of no force or effect until the defendant Hunt executed the consent and joinder appended to the agreement.[3]

It was provided in paragraph 4 of the contract that plaintiff would pay Honolulu the average field price, less a trucking charge of 44¢ a barrel to plaintiff's tanks in Chatham Station, Wyoming, with further provisions for reduction of the trucking charges in the event of certain road improvements and for agreement upon the trucking charges in the event plaintiff should desire to truck the oil to points other than Chatham Station.

The contract was executed by plaintiff and Honolulu and on March 12, 1959, was transmitted to Hunt. After examining the contract the president of Hunt sent a telegram to F. M. Cole of Honolulu which contained the following: "Also, contract does not provide for elimination of trucking charge and change of delivery point in the event we build pipeline". Cole replied on March 18, saying in part:

"As to elimination of trucking charge and change of delivery point, several important questions remain to be settled, such as confirmation of an Oregon Basin connection, confirmation of the maximum delivery rate acceptable to Platte, design of the line, and agreement with co-owners as to apportionment of capital investment and operating costs.

"Future amendment of the March 1, 1959 Northwest contract is contemplated as to trucking charge, delivery point and price, Northwest is ready to install facilities at Oregon Basin in the event of delivery there."

On March 27, 1959, plaintiff wired Hunt:

"In reference to our contract March 1st, 1959, regarding purchasing Fourbear Crude we understand and acknowledge that if and when a pipeline is in operation between Fourbear Field and Platte Pipeline the trucking charges provided in

---

1. While defendants do not concede the truth or materiality of certain facts set forth in plaintiff's requests for admissions, they request the court to consider them as true in ruling on their motions for summary judgment.

2. All deliveries were to be made by Honolulu to plaintiff in Wyoming and title was to pass upon delivery. Payments were to be made to Honolulu at its office in San Francisco, California; and plaintiff was required to maintain a letter of credit in favor of Honolulu in the Midland National Bank of Billings, Montana.

3. This appears in paragraph 15 of the contract, which contains the only reference to Hunt. This paragraph recites that Hunt owns a portion of the oil to be delivered by Honolulu to plaintiff and provides that payment for all oil delivered, including Hunt's share, may be made by plaintiff to Honolulu.

paragraph 4 will terminate and contract is hereby amended accordingly provided however, that Northwest Oil & Refining owns and operates terminal at Platte Pipeline letter of confirmation follows." [4]

On April 3 Hunt wired plaintiff: "Am holding Fourbear Field contract pending receipt your letter of confirmation to wire dated March 27th relative possible pipe line in lieu trucking. Please advise when letter will reach us."

On April 4 plaintiff wrote Mr. Cole of Honolulu "in connection with your phone conversation with this office", quoting plaintiff's telegram to Hunt of March 27. This was accompanied by a hand-written note as follows:

"Mr. Cole—

"Our sec'y is not in this morning so please excuse the penned note. The letter of confirmation referred to is enclosed, per your instructions. We did not write to Hunt direct.

"Sincerely,
from the desk of /s/ M.B.F.
M. B. FitzGerald"

On April 6 Cole wrote the president of Hunt, "We received this morning the attached letter from Northwest Oil & Refining Co., confirming the telegram to you of March 27, 1959 relative to Paragraph 4 of the pending crude oil sales contract of March 1, 1959."

The joinder and consent was executed by Hunt on April 8.[5] On the same date the executed contract was sent to Cole of Honolulu, upon the condition "that before you deliver it to Northwest you will have collected all moneys then due from Northwest under the old contract dated July 15, 1958 * * *." There was no refer-

ence in this letter to any modification of paragraph 4 of the contract.

On April 27 Hunt wired Cole: "Confirming your telephone conversation with Mr. Latham, permission is granted to release contract dated March 1, 1959, between us and Northwest Oil & Refining." The contract, executed by Hunt, was then delivered to plaintiff by Honolulu.

During June, July and August, 1959, there were negotiations among plaintiff, Berry Refining Company, and defendants pertaining to a proposed assignment to Berry of plaintiff's interest in the contract. The contract provided that plaintiff "shall not assign this agreement or any rights hereunder without the written consent of Honolulu".

On July 27, 1959, (and while the negotiations for assignment were in progress) the contract was modified with respect to matters not here pertinent, and the letter agreement contained the following paragraphs:

"Honolulu Oil Corporation hereby consents to the assignment of said sales contract to Berry Refining Company subject to our approval of the form of assignment. We shall require that said assignment include an assumption by Berry Refining Company of the obligations of Northwest under said contract including the obligation to furnish us with an appropriate letter of credit.

"It is our understanding that the subject sales contract will be amended at a later date to adapt the same to the changes which will result from the operation of the Fourbear Pipeline."

On August 6 plaintiff executed an assignment of the contract to Berry, assigning "all of its rights, interests and obliga-

---

4. This is the only reference to any right or obligation on the part of plaintiff to own and operate the terminal. There is no contention that the terminal facilities were ever built by plaintiff or anyone else or that there was any agreement prescribing any terms and conditions with respect to the construction of any terminal.

5. This consent reads: "Hunt Oil Company does hereby join in and consent to the foregoing agreement as to its interest in the oil to be sold thereunder; warrants title to its share of the crude oil sold and delivered thereunder; and does hereby agree that it will look solely to Honolulu Oil Corporation for distribution of its share of the proceeds thereunder."

tions" in and to the crude oil contract dated March 1, 1959, "as amended by that certain letter agreement dated July 27, 1959 * * *".[6] The assignment contained the following paragraphs:

"Assignee agrees, in consideration for the consent hereto by Honolulu Oil Corporation, to amend paragraphs 3 and 4 of said contract in the manner mutually agreed upon by assignee and Honolulu to adapt the same to changes which will result from the operation of the Fourbear Pipeline.

"This assignment shall be effective as of the 1st day of July, 1959."

On August 11 Berry wrote Honolulu, transmitting the assignment for the "purpose of your execution of the approval and assents thereon" and containing the following sentence:

"We expressly have executed it and deliver it on the condition and understanding that our assumption and agreement to be bound and to perform the obligations of the buyer relates only to those obligations accruing on or after July 1, 1959, and that under no circumstance are we assuming obligations, if any, of Northwest Oil & Refining Company incurred prior to the last mentioned date and which may not have been discharged."

Honolulu executed its written consent to the assignment and to the substitution of Berry. This was transmitted to Berry by Honolulu on August 28, 1959, with a letter reading: "Herewith is an executed copy of the Assignment of Crude Oil Contract from Northwest Oil & Refining Company to Berry Refining Company, together with a letter exempting you from obligations of the Northwest Oil & Refining Company incurred prior to July 1, 1959."

Subsequent to the execution of the assignment from plaintiff to Berry, there was no reassignment of any rights thereunder by Berry to plaintiff. On October 22, 1959, plaintiff wrote Honolulu requesting a verification of the status of its account. On November 17, 1959, Honolulu wrote plaintiff "to confirm that Northwest Oil & Refining Company has no balance owing Honolulu Oil Corporation as of this date". There were no further written communications between plaintiff and Honolulu until September 15, 1960, when plaintiff's counsel wrote Honolulu offering "to comply with the terms of the contract relative to the terminal facilities * * *".[7] This action was instituted on December 29, 1960.

The foregoing summarizes the instruments upon which the parties rely in support of their respective contentions.

Plaintiff contends (1) that the contract dated March 1, 1959, was modified by the exchange of telegrams between plaintiff and Hunt on March 27 and April 3, plaintiff's letter to Honolulu dated April 4, and Honolulu's letter to Hunt dated April 6; (2) that by reason of this amendment plaintiff should have been allowed to provide the terminal facilities contemplated in these telegrams and letters; and (3) that the right to own and operate the terminal was not

6. While the assignment referred to the letter amendment of July 27, 1959, there was no mention of any amendment to paragraph 4 by virtue of the exchange of telegrams and letters upon which plaintiff now relies.

7. This letter reads in pertinent part:
"It appears that prior to the acceptance of this contract by Hunt the possibility of setting aside the trucking charges in the event a pipe line was built was raised. In a series of wires and letters, this contingency was covered by acceptance on the part of North-

west Oil & Refining Company of termination of the trucking charges at the time such pipe line should be built conditioned upon Northwest Oil & Refining Company's owning and operating the terminals at Platte Pipe Line.

"Northwest Oil & Refining Company is most anxious to comply with the terms of the contract relative to the terminal facilities in accordance with that agreement. Your cooperation in facilitating the compliance with this agreement is solicited as is your prompt attention to this matter."

assigned to Berry with the balance of the contract. Plaintiff alleges that it is ready, able and willing to provide the terminal facilities and seeks damages for anticipated profits from the operation of the terminal for a period of twenty years.

Defendant contends (1) that the contract of March 1, 1959, was never modified as claimed by plaintiff; (2) that the terminal facilities were never provided for in any contract or modification thereof and were never in fact constructed or operated by plaintiff or anyone else; (3) that all rights of plaintiff under the contract were assigned to Berry (subject only to accounting by plaintiff for crude oil purchased prior to July 1, 1959, the effective date of the assignment); and (4) that plaintiff is estopped by reason of an account stated.

■ A motion for summary judgment should be granted only when it is clear from the pleadings, admissions and affidavits on file that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), F.R. Civ.P., 28 U.S.C.A. "To warrant its entry the facts conceded by the plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances." Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 1951, 189 F.2d 213, 216.[8]

The parties agree that in the first instance two legal questions are presented: (1) whether there was a modification of the contract by the telegrams and letters; and (2) whether all rights of the plaintiff under the contract (aside from plaintiff's obligation to pay for oil purchased prior to June 30, 1959), and particularly any rights arising under paragraph 4, were assigned to Berry. If either of these questions is determined adversely to plaintiff's position, defendants' motions for summary judgment must be granted. In determining these questions the court must view the evidence in the light most favorable to the plaintiff.

■ It seems advisable to determine first whether, by reason of the assignment to Berry, plaintiff has any cause of action under the contract, particularly in view of the fact that the assignment itself makes specific reference to paragraph 4 of the contract. If there is any inconsistency, in whole or in part, between the alleged amendment to paragraph 4 and the provisions with respect thereto in the subsequent assignment, the latter controls and abrogates the earlier agreement.[9]

Here the assignment provides: "Assignee (Berry) agrees, in consideration for the consent hereto by Honolulu Oil Corporation, to amend paragraphs 3 and 4 of said contract in the manner mutually agreed upon between assignee and Honolulu to adapt the same to changes which will result from the operation of the Fourbear Pipeline." This provision clearly relates to the same subject matter as the alleged amendment to paragraph 4 where plaintiff acknowledged that "if and when a pipeline is in operation * * the trucking charges provided in paragraph 4 will terminate and contract is hereby amended accordingly; provided, however, that Northwest Oil & Refining Co. owns and operates terminal at Platte Pipeline". Yet the assignment contains no reservation or exception with respect to any right or obligation of plaintiff to build or operate terminal facilities pur-

---

8. See also Hycon Manufacturing Company v. H. Koch & Sons, 9 Cir., 1955, 219 F. 2d 353, 355, certiorari denied 349 U.S. 953, 75 S.Ct. 881, 99 L.Ed. 1278; Cameron v. Vancouver Plywood Corporation, 9 Cir., 1959, 266 F.2d 535.

9. See Hanover Canal Co. v. Wilson, 1914, 22 Wyo. 427, 143 P. 345, and cases there cited.

suant to the alleged amendment of paragraph 4 and makes no reference thereto. On the contrary, it is expressly recognized in the assignment that paragraph 4 would be amended in the manner agreed upon between Berry and Honolulu.[10]

■ It is true, as plaintiff contends, that an assignment "may be limited by exceptions, reservations, conditions, or restrictions contained therein" (6 C.J.S. Assignments § 90, p. 1144); and that "the question of what rights or remedies will pass as incidental to the thing assigned is dependent entirely upon the intention of the parties; and the assignee will acquire no right to incidents which it is clear the parties did not intend to pass, or which it would be inequitable to pass because of the resulting injury to the assignor" (6 C.J.S. Assignments § 85, p. 1143). On the other hand, it is well settled that an assignment, in general terms, vests in the assignee all right, title and interest of the assignor, unless there are subsequent restrictions which limit the scope of the assignment (6 C.J.S. Assignments § 84, p. 1140).

■ An assignment must be interpreted or construed in accordance with the rules of construction governing contracts generally, the primary purpose being to ascertain and carry out the intention of the parties. (6 C.J.S. Assignments § 83, p. 1138). The intention of the parties is to be deduced from the language employed by them, and the terms of the contract, where unambiguous, are conclusive. Moreover, the contract must be construed as a whole, and it is not the province of the court to make a contract for the parties.[11]

■ Plaintiff argues that the "right to own and operate the terminal was not assigned with the balance of the contract to Berry as it was severable from the March 1, 1959, contract, and it was not intended to be included nor was it included in the assignment". In addition to the assignment itself, plaintiff relies upon Berry's letter to Honolulu dated August 11, 1959, which provides in pertinent part that the assignment was delivered on the condition and with the understanding that Berry's assumption of the obligations of the buyer related "only to those obligations accruing on or after July 1, 1959", and that it did not assume the "obligations, if any" of plaintiff incurred prior to that date "and which may not be discharged".

The assignment prescribes an effective date of July 1, 1959. Honolulu's consent provided that nothing contained in the assignment should relieve plaintiff "of the duty to reimburse Honolulu for all oil delivered * * * prior to the effective date of this assignment". In agreeing to the substitution of Berry for plaintiff, Honolulu agreed to hold plaintiff harmless for "all obligations arising under this contract after the date of June 30, 1959". Plaintiff executed the assignment and received and accepted Honolulu's consent thereto.

It is clear, both from the assignment itself and the letter, that the exception referred to plaintiff's "obligation" to pay

---

10. There is no contention that the pipeline had been constructed at the time of the assignment. In fact, the provisions of paragraph 4 of the contract relating to trucking charges were subsequently amended by agreement between Berry and Honolulu for the period commencing August 16, 1959, and "ending either on the date Honolulu's Fourbear Pipeline is placed in operation or January 1, 1960, whichever date shall first occur". The pipeline was completed and placed in operation in March, 1960.

11. See 17 C.J.S. Contracts § 296 p. 695; 3 Williston on Contracts, Rev.Ed.1752, § 610; Flora Construction Company v. Bridger Valley, Etc., Wyo.1960, 355 P. 2d 884; Barlow v. Makeeff, 1955, 74 Wyo. 171, 284 P.2d 1093; Hein v. Fox, 1953, 126 Mont. 514, 254 P.2d 1076; Leigland v. McGaffick, 1959, 135 Mont. 188, 338 P. 2d 1037.

for oil purchased prior to July 1, 1959. Plaintiff had not in fact incurred any "obligation" to build any terminal facilities;[12] and it was contemplated by all parties that Honolulu's consent to the assignment was conditioned upon Berry's agreement to amend paragraphs 3 and 4 of the contract "to adapt the same to changes which will result from the operation of the Fourbear Pipeline". Assuming, arguendo, that paragraph 4 of the contract was amended as plaintiff contends, neither the assignment itself nor any other writing provides for any reservation in plaintiff of any rights under paragraph 4 or any other right, title or interest in the contract. The sole exception and reservation relates to the "obligation" of plaintiff to pay for crude oil purchased prior to the effective date of the assignment. Prior to the commencement of this action, there was a final settlement between plaintiff and defendant with respect to this obligation.

 Plaintiff, having assigned all of its right, title and interest in the contract, no longer has any interest therein and may not accordingly maintain this action. In both Wyoming and Montana, as well as under the federal rules, an action must be prosecuted by the real party in interest. Where all rights under a contract have been transferred, the assignee is the real party in interest.[13]

Having reached this conclusion, it is unnecessary to determine the effect of the alleged modification of the contract through the exchange of telegrams and letters.

The motions for summary judgment are granted.

---

12. At most plaintiff agreed to a termination of the trucking charges in the event it owned and operated the terminal.

13. See Rule 17(a), F.R.Civ.P.; Dunham v. Robertson, 10 Cir., 1952, 198 F.2d 316; Gate-Way Inc. v. Hillgren, 9 Cir., 1950, 181 F.2d 1010, affirming D.C., 82 F.Supp. 546; National Reserve Co. of America v. Metropolitan Trust Co., 1941, 17 Cal. 2d 827, 112 P.2d 598; Williard v. Campbell, 1932, 91 Mont. 493, 11 P.2d 782; Davis v. Claxton, 1928, 82 Mont. 574, 268 P. 787.